1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                  FOR THE EASTERN DISTRICT OF CALIFORNIA

9   CELSO LEON,

10          Petitioner,                    No. CIV S-04-2631 FCD JFM P

11      vs.

12   A. P. KANE, Warden, et al.,

13          Respondents.            <u>FINDINGS AND RECOMMENDATIONS</u>

14   _____/

15          Petitioner is a state prisoner proceeding pro se with an application for a writ of

16   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is serving a sentence of 15 years to life,

17   plus a two year enhancement, following his 1986 conviction on charges of second degree murder

18   with the use of a firearm.  Petitioner challenges the January 23, 2001 decision of the California

19   Board of Prison Terms (Board) to deny him a parole date.  Petitioner contends that he was

20   deprived of a constitutionally protected liberty interest without sufficient evidence; that the Board

21   abused its discretion by its arbitrary and capricious use of its regulations; and that the Board

22   violated his right to due process by applying the "some evidence" standard in a manner contrary

23   to law or by an unreasonable application of established Supreme Court authority.

24                         PROCEDURAL HISTORY

25          1.  The decision to deny parole became final on February 16, 2001.  Petitioner

26   filed an appeal.  (Answer, Ex. D.)  The appeal was denied with one exception – because the

1  psychological reports did not include evidence petitioner suffers from any mental health issues,

2  the parole decision was modified by removing all references to therapy.  (Id.)  The appeals unit

3  found that there was ample evidence to support the unsuitability finding.  (Id.)

4          2.  On May 8, 2002, petitioner filed a petition in the Fresno County Superior

5  Court challenging the Board's decision.  Respondents believe that petition was denied.

6          3.  Petitioner filed a petition for writ of habeas corpus in the Court of Appeal,

7  Fifth Appellate District, which was summarily denied on July 29, 2004.  (Answer, Ex. F.)

8          4.  Petitioner's petition for review was denied by the California Supreme Court on

9  October 20, 2004, en banc and without comment.  (Answer, Ex. F.)

10          5.  Petitioner filed the instant action on December 13, 2004.

11                          STATEMENT OF FACTS[1]

12          On the night of August 8, 1985, Manuel DeLeon (DeLeon) was
shot and killed at the Mexico Café in Parlier.  Augustine Morales
13          testified he had been working with DeLeon and accompanied him
to the bar in order to use the bathroom.  When Morales emerged
14          from the bathroom, he saw DeLeon talking to two or three other
men whom he could not identify.  At some point in the evening
15          Morales was struck and carried from the bar, and as he was being
carried out, he heard gunshots.  Morales did not overhear any of
16          the discussion between DeLeon and the other men because of the
noise in the bar.

17

18          Pedro DeLeon (Pedro), a cousin of DeLeon's, was in the Mexico
Café when DeLeon came in.  Pedro observed DeLeon talking with
19          Morales and with [petitioner].  He also saw [petitioner] strike
Morales, causing him to fall against the pool table.  DeLeon tried
20          to intervene.  [Petitioner] shot at DeLeon from a distance of about
three steps and ran from the scene.  Pedro heard three shots fired.
21          DeLeon had no weapon; [petitioner] had removed a gun from his
own waistband.  Pedro testified there were two other men with
22          [petitioner] that evening, who might have been a father and son;
one of these men tried to push [petitioner's] hand up to prevent
23          him from shooting DeLeon.  Pedro never saw DeLeon hit
[petitioner], nor did he ever see [petitioner] fall to the ground.

24

25          [1]  The facts are taken from the opinion of the California Court of Appeal for the Fifth
Appellate District in People v. Leon, No. F007213 (December 1, 1987), a copy of which was
26  lodged as Exhibit #4 to Respondent's Response on May 5, 2008.

Manuela Lopez, a waitress in the Mexico Café on the night of August 8, 1985, saw DeLeon talking to [petitioner] before any shots were fired.  Lopez identified [petitioner] in the courtroom.  Lopez had seen [petitioner] arrive in the bar that evening accompanied by three adults and a young boy.  Lopez refused to serve any of the adults because of the presence of the boy, and when [petitioner] insisted on service, Lopez went to talk to the manager.

When Lopez saw [petitioner] and DeLeon talking, she feared there might be a fight because [petitioner] appeared to be angry.  She was on her way toward the men when the shots were fired.  Lopez heard DeLeon "like as if he were saying to forgive him" and [petitioner] "just took out the pistol and fired it" towards DeLeon from about three or four feet away.  A boy or young man who was with [petitioner] tried to hold him, but [petitioner] pushed him away.  Lopez testified DeLeon had no weapon in his hands nor did Lopez see any weapon near the body when she turned DeLeon over because he appeared to be choking.  Lopez did not see anyone hit or kick [petitioner], and she never saw [petitioner] fall to the floor.

Sergio Garcia, who was with DeLeon in the Mexico Café on August 8, saw DeLeon get into an argument with [petitioner] and Morales.  Garcia identified [petitioner] in the courtroom and testified he had previously seen [petitioner] in the nearby jewelry store which [petitioner] owned.  [Petitioner] was with his son, Pete, and another man they called "Guerro."  Garcia thought the argument had started when Morales bumped into [petitioner].  DeLeon moved closer to [petitioner] after the bumping incident but had no weapon.  [Petitioner] struck Morales, and DeLeon "threw a gloved fist at [petitioner]."  Garcia never saw DeLeon kick [petitioner].

Adan Buenrostro, the bartender in the Mexico Café, heard the gunshots fired the night of August 8 and, after hearing the shots, saw [petitioner] with a gun in his hand.  Buenrostro saw [petitioner] leave the bar.  Buenrostro knew [petitioner] from the bar and the adjacent Corral Café, and he knew [petitioner] had a jewelry store.  Buenrostro testified he knew [petitioner] to be nonviolent when he was sober but had heard [petitioner] would get into fights with friends when he was drunk.  Maria Trejo, the cashier at the Mexico Café, looked toward the bathroom in time to see [petitioner] draw his weapon.  She yelled to Buenrostro just as she heard the shots fired.  Trejo never saw [petitioner] knocked to the floor before the shooting.

Francisco Mejia was outside the Mexico Café when he heard shots fired.  He saw [petitioner] run out of the bar and recognized [petitioner] from prior businesses [petitioner] had operated; Mejia saw [petitioner] get into his car and leave the area with tires squealing.  As [petitioner] left, he bumped into Mejia's car.

[Petitioner] was driving a green car, high in the back, with a "For Sale" sign on it.

Detective Joe Rascon, who had been assigned to investigate the homicide, conducted a search for a green two-door Dodge and found the car in the early morning hours of August 9, apparently abandoned in the area of Manning and McCall Avenues. Shoe tracks led from the vehicle to the intersection. James Tarver, a criminalist with the sheriff's department who participated in the investigation, testified that a pair of light tan half-boots with a pointed toe seized in a search of [petitioner's] residence shared positive class characteristics (size, sole size, and sole design) with the tracks leading from the vehicle. Tarver could not say positively that the shoes seized from [petitioner's] house had left the prints at the scene, but they certainly could not be excluded. The abandoned Dodge car in question had been lent to [petitioner] by Gabriel Torres who recovered the car from the police impound yard.

When police officers responded to the scene of the Mexico Café, DeLeon was found lying on the floor in a pool of blood and showed no signs of life. Homicide detective Scott Morrison later checked the bar for two rounds of ammunition which had not been found in the body. He found one embedded about 18 inches from the floor in a stack of beer cans and the other embedded in the ceiling. Detective Pete Chavez, designated the investigating officer on the case, testified that he had interviewed Sergio Garcia in Spanish at the time of the homicide and, although Garcia told Chavez that [petitioner] had struck DeLeon, he said nothing about DeLeon hitting [petitioner]. Chavez also interviewed Augustine Morales, who stated he had been present during the shooting. Morales told Chavez he heard [petitioner] cursing at DeLeon, and when Morales approached and asked what was going on, [petitioner] struck him and told him to shutup. [Petitioner] then told DeLeon he was "gutless." Morales saw [petitioner] with a gun and heard the shots.

Dr. Jerry Nelson, a pathologist, testified that the autopsy revealed DeLeon died as the result of a single gunshot wound entering the front of the neck at an angle of 5 degrees upward and 10 degrees to the right, assuming the victim was standing vertically on flat ground. The wound caused massive hemorrhage and asphyxia since it passed through the larynx. The bullet struck the fourth and fifth cervical vertebrae and penetrated the left side of the spinal cord, partially severing it and throwing the victim into deep shock.

<u>Defense Case</u>

Homero Salinas testified that he had driven to Parlier on August 8 with his brother and his three-year-old son in order to see Pete Leon and talk to him about acting as godfather at a baptism. At about 6 p.m., Salinas went to the jewelry store owned by [petitioner] and Pete; he stayed there talking until 10 p.m. when the three left to go to the Mexico Café for some dinner. At some point Salinas and Pete went to the bathroom, and as they emerged they

saw [petitioner] walking toward them.  Three men were following him.  [Petitioner] stopped when he encountered Salinas and Pete, and Salinas went and ordered three more beers.  The three men were then surrounding [petitioner] , and one of the three tried to pick a fight, stating "I'm going to kick your ass."  Salinas testified [petitioner] never swore at DeLeon and instead expressed a desire to leave the bar.  Pete tried to intervene.  The man who had threatened to kick [petitioner's] ass put his hand on Pete's face and pushed him back.  [Petitioner] again tried to leave, but as he started walking away, another of the three struck [petitioner] twice in the back of the head.  [Petitioner] fell to the ground, he was struck again in the face, and the man who had struck him began to kick him in the side.  Salinas and Pete restrained the other two men to prevent them from joining into the fight.  Salinas heard shots fired and ran from the bar.

[Petitioner] testified on his own behalf; his testimony was basically consistent with that of Homero Salinas.  [Petitioner] testified that after he had been knocked to the floor, one of his assailants kicked him, beat him in the face, and then placed his knee on [petitioner's] chest.  [Petitioner] became short of breath and feared that the man was going to kill him.  [Petitioner] then recalled he was carrying a pistol since he was wearing about $12,000 worth of jewelry which he had not wanted to leave in the jewelry store; he pulled the gun from his waistband.  He fired upward at about a 45 degree angle, and the first two shots he fired were intended to frighten his assailant.  [Petitioner] saw that the third shot he fired struck the assailant; he testified he had not wanted to do this and only shot out of fear that he was going to be killed.  [Petitioner] started to drive home but the car stalled; he then called his son, Pete.  Pete took [petitioner] home, where [petitioner] had a couple of beers to calm down and then called the police from a neighbor's house to report his car stolen.  [Petitioner] testified, "it was a way of turning myself in, because I did not want to flee, because I knew that I had done a wrong thing."

(People v. Leon, slip op. at 2-7)

ANALYSIS

I.  Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

/////

1         (2) resulted in a decision that was based on an unreasonable
        determination of the facts in light of the evidence presented in the
2         State court proceeding.

3 28 U.S.C. § 2254(d).

4         Under section 2254(d)(1), a state court decision is "contrary to" clearly

5 established United States Supreme Court precedents if it applies a rule that contradicts the

6 governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

7 indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

8 result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406

9 (2000)).

10         Under the  "unreasonable application" clause of section 2254(d)(1), a federal

11 habeas court may grant the writ if the state court identifies the correct governing legal principle

12 from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

13 prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

14 simply because that court concludes in its independent judgment that the relevant state-court

15 decision applied clearly established federal law erroneously or incorrectly.  Rather, that

16 application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, __ U.S. __, 123

17 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent review

18 of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

19         The court looks to the last reasoned state court decision as the basis for the state

20 court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

21 reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

22 habeas court independently reviews the record to determine whether habeas corpus relief is

23 available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

24 II.  Petitioner's Claims

25         The January 23, 2001 decision challenged herein was made at a subsequent parole

26 consideration hearing.  (See Exhibit B to Answer to Petition for Writ of Habeas Corpus, filed

1   February 23, 2005.)  In its decision, the Board concluded that petitioner was not suitable for

2   parole and "would pose an unreasonable risk of danger to society or a threat to public safety if

3   released from prison."  (Ex. B to Answer, at 28.)  The Board relied principally on petitioner's

4   commitment offense.  (Id.)  The Board noted petitioner did not have an arrest or a conviction

5   record, but admitted to coming to the United States illegally and carrying a concealed weapon

6   without a permit.  (Ex. B to Answer, at 29.)  The Board found petitioner had "not yet sufficiently

7   participated in beneficial self-help []² programming."  (Id.)

8           The Board found the psychological report of Dr. M. Carswell "not totally

9   supportive of release."  (Id.)  Although the report stated petitioner showed good insight into his

10  commitment offense, the Board was concerned that petitioner's "recollection of the events are

11  nowhere near what the jury heard or the appellate court heard or the presiding judge or what

12  witnesses said."  (Id.)  While the report concluded petitioner had a violence potential estimated to

13  be only slightly higher than the average citizen in the community, the Board found that it was

14  slightly higher based on the significant risk factor that if petitioner returned to alcohol, his

15  dangerousness would increase.  (Id.)  The correctional counselor found petitioner would "pose a

16  moderate degree of threat if released to the public."  (Id. at 30.)

17          The Board noted petitioner has an INS hold but has residential plans if paroled to

18  Mexico.  (Id. at 29.)  However, petitioner did not have proof of employment plans.  (Id.)

19          The Board commended petitioner for being disciplinary-free since 1997, and

20  noted he had only received one 115 which he received in 1997.  (Id.)  Petitioner had

21              been in AA for quite a while, took a parent education program and
            then took some courses in transmitted diseases, Hepatitis, TB and
22          sexually transmitted diseases and he also has a laudatory chrono
            for his progress in the graphic arts offset printing vocation where
23          he has completed some of the units towards that vocation.

24  (Id. at 30.)

25  ────────────────────

26      ²  The words "and therapy" were ordered removed pursuant to the appeals unit.  (Answer,
    Ex. D.)

1    Ultimately, the Board found those positives did not outweigh the following

2    factors:  his commitment offense which was carried out in an especially cruel manner; a recent

3    psychological report which demonstrated a need for a longer period of observation and

4    evaluation or treatment; petitioner had not completed programming essential to his adjustment

5    and needed additional time to gain that programming; and he needed to more fully participate in

6    self-help programming and to complete a vocation.  (Id. at 30-31.)

7    A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of

8    some transgression of federal law binding on the state courts, see Middleton v. Cupp, 768 F.2d

9    1083, 1085 (9th Cir.1985), and is unavailable for alleged errors in the interpretation or

10   application of state law, see Lewis v. Jeffers, 497 U.S. 764, 780 (1990).  For this reason,

11   petitioner's claims arising out of alleged violations of state law are not cognizable in this federal

12   habeas corpus action.

13   California's statutory scheme governing parole "creates in every inmate a

14   cognizable liberty interest in parole which is protected by the procedural safeguards of the Due

15   Process Clause."  Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); see also Sass v.

16   California Board of Prison Terms, 461 F.3d 1123, 1127-28 (9th Cir. 2006).  "'[T]he Supreme

17   Court ha[s] clearly established that a parole board's decision deprives a prisoner of due process

18   with respect to this interest if the board's decision is not supported by "some evidence in the

19   record," or is "otherwise arbitrary."'  Hayward v. Marshall, 512 F.3d 536, 542 (9th Cir. 2008)

20   (quoting Irons v. Carey, 505 F.3d 846, 851 (9th Cir. 2007) (in turn quoting Superintendent v.

21   Hill, 472 U.S. 445, 457 (1985)).

22   California law allows the Board to consider a myriad of factors
     when weighing the decision of granting or denying parole. Parole

23   may be denied if the Board "determines that the gravity of the
     current convicted offense or offenses, or the timing and gravity of

24   current or past convicted offense or offenses, is such that
     consideration of the public safety requires a more lengthy period of

25   incarceration for [the] individual." Cal.Penal Code § 3041(b).

26   Biggs, at 915.

8

> The regulations governing the parole process provide six nonexclusive factors tending to show unsuitability for parole and nine nonexclusive factors tending to show suitability. The factors tending to show unsuitability are: (1) Commitment Offense; (2) Previous Record of Violence; (3) Unstable Social History; (4) Sadistic Sexual Offenses; (5) Psychological Factors; and (6) Institutional Behavior. 15 Cal.Code Regs. § 2402(c). In terms of the first factor, "Commitment Offense," the regulations explain that it tends to show unsuitability when "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner." Id. at § 2402(c)(1). The factors indicating suitability for parole are: (1) No Juvenile Record; (2) Stable Social History; (3) Signs of Remorse; (4) Motivation for the Crime; (5) Battered Woman Syndrome; (6) Lack of Criminal History; (7) Age; (8) Understanding and Plans for the Future; and (9) Institutional Behavior. 15 Cal.Code Regs. § 2402(d).

Irons, 505 F.3d at 851 n.4. "Even though these suitability and unsuitability factors are helpful in analyzing whether a prisoner should be granted parole, California courts have made clear that the 'findings that are necessary to deem a prisoner unsuitable for parole,' Irons, 505 F.3d at 850, are not that a particular factor or factors indicating unsuitability exist, but that a prisoner's release will unreasonably endanger public safety." Hayward, at 543 (state law citations omitted).

Petitioner claims that there was no evidence to support application of any of the unsuitability factors to him, that there was substantial evidence to support application of several of the suitability factors to him, and that the evidence showed he would pose very little danger to the community if released.

Petitioner was received in state prison on March 26, 1986 following his December 26, 1985 conviction for second degree murder while armed with a firearm. (Ex. A to Answer.) Petitioner was sentenced to an indeterminate term of fifteen years to life in prison, plus two years for the weapons enhancement. (Id.) Petitioner's initial parole consideration hearing was held on April 30, 1996, at which time parole was denied for a period of two years. (Ex. B to Answer, at 1.) The Board's January 23, 2001 decision was petitioner's fourth denial of parole. (Traverse at 4.) Petitioner's bid for parole has been denied two more times since. (Id.)

/////

1          As noted above, the Board relied principally on petitioner's commitment offense

2   and the finding that he poses a significant risk to the community if he resumes his alcohol

3   consumption.  The record reflects that there was some evidence before the Board to support the

4   description of petitioner's commitment offense.  Petitioner claims that this factor alone is

5   insufficient to support a finding of present dangerousness required to justify the denial of parole.

6   Specifically, petitioner contends that he has been disciplinary-free since 1997 and that the

7   evidence showed he poses little threat to the community.  Moreover, petitioner contends there is

8   no evidence to support the Board's finding that he presents a significant risk based on his prior

9   alcohol abuse.  Petitioner argues he has attended AA for many years and has suffered no prison

10  disciplinaries for alcohol or substance use during his 22 years of incarceration.  (Traverse at 19.)

11         The record before the Board at the time of the 2001 hearing contains substantial

12  evidence contrary to the Board's conclusion that petitioner "would pose an unreasonable risk of

13  danger to society or a threat to public safety if released from prison."  In Dr. Carswell's 2000

14  psychological evaluation, petitioner noted he had attended AA for 20 years and had been sober

15  for 16 years.  (Lodged Documents at 78 [docket no. 14-3].)  The Axis I diagnostic impression

16  was alcohol abuse, in institutional remission.  (Id.)  "Should this inmate at this time be given a

17  parole or release date, it is expected he will be able to maintain his present gains in the

18  community."  (Id. at 79.)  The psychological evaluation assessed his level of dangerousness as

19  follows:

20              A.  Considering the fact this inmate has not had a CDC-115
                violation since 1987 [sic], he would be considered a less than
21              average risk for violence when compared to this Level II inmate
                population.
22
                B.  If released to the community, his violence potential is estimated
23              to be only slightly higher than the average citizen in the
                community.
24
                C.  Obviously, the most significant risk factor as a precursor to
25              violence for this inmate would be a return to the use of alcohol.

26  (Id. at 79.)  Petitioner described his commitment offense to the psychologists as follows:

1     the crime was in self-defense.  There was a problem with the
victim and his son.  He did not know the victim and states that he
2     is very sorry about what happened, that today he would have done
something very different, and that he prays every day for everyone
3     in his family and the victim's.  He also stated that the judge had
some questions and was wavering while considering his guilt or
4     innocence, and finally decided that the inmate was guilty.

5  (Id. at 79.)  Dr. Carswell made the following observations, comments and recommendations:

6     A.  This inmate is responsible for his behavior.  He has the ability
to abide by institutional standards and has generally done so during
7     his incarceration period.

8     B.  This inmate has no mental health disorder which would
necessitate treatment either during his incarceration period or after
9     parole.

10     C.  Since this inmate appears to have an alcohol problem, periodic
alcohol and drug testing as a mandatory part of parole is
11     recommended.

12  (Id. at 79-80.)

13       Petitioner's classification score was reduced to zero on March 17, 1994.  (Id. at 5

14  [docket no. 15-3].)  His classification score remained zero as of April 2000.  (Id. at 90 [docket

15  no. 15-5.])

16       At his March 10, 1993 classification hearing, it was noted that petitioner was

17  medically inhibited due to back problems.  (Id. at 9 [docket no. 15-3; see also id. at 22 [docket

18  no. 15-3].)  The 1994 Life Prisoner Evaluation Report noted petitioner had a CDC 128-C dated

19  August 11, 1994 noting petitioner's chronic low back pain.  (Id. at 109 [docket no. 15-5.])

20       At his May 3, 2000 annual classification hearing, petitioner was assigned to

21  vocational print shop.  (Id. at 11 [docket no. 15-3].)  Petitioner had "two periods of average or

22  above performance in work, school or Vocational Program."  (Id.)  Petitioner had been assigned

23  to the Vocational Print Shop since January 5, 1999 with satisfactory ratings.  (Id. at 91 [docket

24  no. 15-5.])  In 1998, petitioner worked in culinary.  (Id. at 13 [docket no. 15-3.])  Petitioner was

25  previously employed as a tailor and watch and jewelry repairman.  (Id. at 22 [docket no. 15-3.];

26  /////

1  see also id. at 87 [docket no. 15-5.])  At the time of his commitment offense he had a jewelry

2  store in the Fresno area in partnership with his son.  (Id. at 20 [docket no. 15-6.])

3         Petitioner has been informed that the Foreign Prisoner Transfer Treaty Program

4  (FPTTP) applies and he could complete his sentence in Mexico, but petitioner declined stating he

5  has family residing in California.  (Id. at 15 [docket no. 15-3.])

6         Petitioner has received no serious rules violation reports since he was

7  incarcerated.  In 1997, petitioner's received an administrative 115 for alteration of state material.

8  (Id. at 20 [docket no. 15-3.]; see also id. at 94 [docket no. 15-5.])

9         Petitioner started attending Alcoholics Anonymous in April or May of 1991.  (Id.

10  at 5 [docket no. 15-6.])  Petitioner had 100% attendance from May 1991 through June 1991.  (Id.

11  at 6.)  May 6, 1992 128B chrono shows petitioner had a 94% attendance at Level III Hispanic AA

12  group from May 8, 1991 to May 6, 1992.  (Id. at 6 [docket no. 15-6.])  Petitioner's central file

13  contains confirmation of petitioner's active participation in AA from July 1992 through

14  December 1992, having attended 28 of 28 meetings held.  (Id. at 26, 44 [docket no. 15-4.])

15  Petitioner participated in AA as documented by CDC 128B's dated February 24, 1994, May 24,

16  1994, October 21 & 26, 1995, December 22, 1995, October 29, 1996, August 29, 1997, February

17  24, 1998, August 1, 1998, September 30, 1998, December 29, 1998, April 7, 1999, July 6, 1999,

18  and September 30, 1999 and January 21, 2000.  (Id. at 2-3 [docket no. 15-6], 107, 103-04, 95-97

19  docket no. 15-5.])  The December 29, 2000 addendum to the parole consideration hearing states

20  that petitioner participated in AA "as documented on CDC 128B dated 5-2-00, 1-21-00, and 9-

21  30-99."  (Id. at 89 [docket no. 15-5.])  The Life Prisoner Evaluation Report, dated April 2000,

22  states petitioner "is a current member of Alcoholics Anonymous and has been a member since

23  October 1993."  (Id. at 91-92 [docket no. 15-5.])

24         Petitioner was assigned to Education as an ESL student from October 5, 1996

25  February 2, 1998, and received satisfactory ratings.  (Id. at 92 [docket no. 15-5.])  Petitioner

26  received his GED.  (Id. at 95 [docket no. 15-5.])  He was assigned to Lunch Box Crew from

1  February 21, 1998 to October 1, 1998, with satisfactory ratings.  (Id. at 92 [docket no. 15-5.])

2  Petitioner received a completion certificate for the Parent Education Program, (id. at 40-42

3  [docket no. 15-4]), and a certificate of achievement for his completion of the Reading Levels A

4  & B of the PLATO computer assisted learning program.  (Id. at 43.)

5         Despite petitioner's model behavior in prison and his continued participation in

6  AA, Correctional Counselor Baker wrote in the April 2000 Life Prisoner Evaluation Report:

7             Considering the commitment offense, prior record and prison
              adjustment, this writer believes the prisoner would pose a moderate
8             degree of threat to the public at this time, if released from prison.
              [Petitioner's] crime consisted of the 1985 shooting of a man during
9             an altercation.  [Petitioner] was intoxicated and seems to have
              become disproportionately angry during the incident.  What
10            concerns this writer is that the victim was attempting to apologize
              to [petitioner] for having brushed against him when he (the victim)
11            was fatally shot for no apparent reason.  [Petitioner's] version of
              the story:  that he shot the victim out of self-defense is not
12            substantiated by the available facts of record.  It is my opinion,
              should [petitioner] return to using drugs (alcohol), his degree of
13            threat to the public would be much higher, therefore, it is
              recommended that he continue to participate in Alcoholics
14            Anonymous and Narcotics Anonymous.  In addition, [petitioner]
              could benefit from anger control therapy since the crime was a
15            direct result of anger under the influence of alcohol, as indicated in
              the previous report.

16

17  (Id. at 92 [docket no. 15-5.])

18         This report stands in contrast to the psychological evaluation issued January 2,

19  1998, which states petitioner "does not have a mental health disorder which would necessitate

20  treatment either during his incarceration period or following parole."  (Id. at 15 [docket no. 15-

21  6.])  Dr. Terrini stated petitioner "demonstrated some insight into his commitment offense and

22  his judgment appeared to be normal."  (Id. at 14 [docket no. 15-6.])  Dr. Terrini concluded:

23            1) [Petitioner] is competent and responsible for his behavior.  He
              has the capacity to abide by institutional standards and has
24            generally done so during his incarceration.

25  /////

26  /////

13

2)  Given his lack of a criminal history, his lack of a violent
criminal history, his relative lack of CDC-115s and his lack of
violent CDC-115s, his violence potential is estimated to be below
average relative to this inmate population.

3)  As [petitioner] apparently had an alcohol problem, monitoring,
as well as attendance at Alcoholics Anonymous, should be
mandatory conditions of parole.

4)  [Petitioner] does not have a mental health disorder which would
necessitate treatment either during his incarceration period or
following parole.

(Id. at 15 [docket no. 15-6.])  Dr. Kitt, in his 1994 psychiatric evaluation stated that "[a]lthough

the possibility of alcohol abuse may have existed at [the time of the offense], it is not a current

problem."  (Id. at 18 [docket no. 15-6.])  He opined,

There is no relationship between any psychopathology and the
criminal behavior.  While incarcerated [petitioner] has
psychiatrically improved slightly due to increasing age and
possible benefits of attending Alcoholics Anonymous meetings.  In
a less controlled setting such as a return to the community, he is
likely to maintain his gains."
. . .

He is not in need of any psychotherapy.

(Id. at 18 [docket no. 15-6.])  These reports track an even earlier psychological evaluation, dated

July 21, 1989, where Dr. Davis concluded:

A major mental disorder was not a factor in the commitment
offense nor does [petitioner] suffer from such a disorder at this
time.  His mental status is stable and is likely to remain so.  He
expresses a desire to utilize his time while incarcerated in a
productive manner, and it is anticipated he will do so.  He might
benefit from attendance at Alcoholics Anonymous in an attempt to
ascertain the role alcohol has played in his life.  Violence potential
is considered below that of the average inmate.

(Id. at 21 [docket no. 15-6.])  None of these psychologists reference an anger management

problem.

The United States Court of Appeals for the Ninth Circuit has held that after an

inmate has "served the minimum number of years required by his sentence," Irons, 505 F.3d at

14

1  853, extended reliance solely "an unchanging factor, the circumstance of the offense and conduct

2  prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and

3  could result in a due process violation." <u>Biggs</u> at 917.[3]

4         The 2001 decision to deny petitioner parole was the fourth denial of parole

5  premised almost entirely on petitioner's commitment offense and alcohol abuse.  The record

6  demonstrates that at the time of the June 2001 decision the Board continued to rely on the

7  commitment offense as well as petitioner's alcohol abuse at the time of the commitment offense,

8  both unchanging factors.  There is no evidence in the record that petitioner has abused alcohol

9  while in prison or that he has denied a need to attend AA; rather, the record demonstrates a long

10  and continued history of attendance and participation in AA since at least 1991.

11         While the record is clear that there was a strong causal connection between

12  petitioner's use of alcohol and his violent crime, his past use of alcohol does not by itself

13  reasonably establish current unsuitability because there is no additional evidence to complete a

14  chain of reasoning between his past alcohol use and a finding that because of it he currently

15  poses an unreasonable risk of danger if released.[4]  In other words, in the absence of some

16  evidence to support a reasonable belief that petitioner might start using alcohol again, the fact

17  that he abused alcohol more than 20 years ago does not by itself represent some evidence that he

18  is currently dangerous.

19         Moreover, here the record does not contain any evidence to support reasonable

20  grounds to believe petitioner might start using alcohol if released.  There is no evidence that

21  petitioner's former desire for alcohol might still be present.  The record reveals that he has been

22  clean and sober for a substantial period of time.  There is no evidence that he refused, failed, or

23  

24     [3]  The parole decision at bar was made fifteen years after petitioner's fifteen years to life sentence commenced.  Petitioner has now been incarcerated twenty-two years.

25     [4]  The record provides no other past evidence of alcohol abuse, such as citations or

26  convictions for drunk driving.  Petitioner has no criminal record, either juvenile or adult, other than his commitment offense and illegally entering the United States.

did poorly in AA; rather the record demonstrates an active participation therein.  And there is no

evidence that petitioner ever used any type of illicit substance or alcohol during his incarceration.

Nor does the record support a reasonable belief that without further attendance at AA in prison,

petitioner might start using alcohol again.  "[A]lthough the state expects prisoners to behave well

in prison, the absence of serious misconduct in prison and participation in institutional activities

that indicate an enhanced ability to function within the law upon release are factors that must be

considered on an individual basis by the Governor in determining parole suitability."  In re

Rosenkrantz, 29 Cal.4th 616, 682, 128 Cal.Rptr.2d 104 (Cal. 2002).

        The fact that alcohol abuse was involved in petitioner's commitment offense does

not constitute some evidence that petitioner might start using alcohol and become violent again,

and therefore that he currently poses an unreasonable risk of danger without further treatment.

Indeed, if petitioner's past use of alcohol established this unsuitability, the Board could deny

parole for the rest of petitioner's life based on this unchanging factor, without regard to

subsequent evidence that petitioner has no current desire for alcohol and that there is little current

likelihood of alcohol relapse, let alone a return to violent conduct as a result of it.  The Board's

passing reference that petitioner "had been in AA for quite awhile" demonstrates the Board failed

to appropriately acknowledge petitioner's long and faithful commitment to the AA program.

        The Board's reliance on the circumstances of petitioner's criminal offense to

support the denial of parole was unsupported by any evidence in the record sufficient to meet the

applicable legal standard.  In language that on this record appears to be boilerplate, it found that

the commitment offense was "carried out in an especially callous manner" and that "the motive

for the crime was very trivial in relation to the offense."  These terms have been defined by the

California courts as follows:

> A prisoner's commitment offense may constitute a circumstance
> tending to show that a prisoner is presently too dangerous to be
> found suitable for parole, but the denial of parole may be
> predicated on a prisoner's commitment offense only where the
> Board can "point to factors beyond the minimum elements of the

1
2
3
4
5
6

crime for which the inmate was committed" that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released.  [In re] Dannenberg, 34 Cal.4th [1061] at 1071, 23 Cal.Rptr.3d 417, 104 P.3d 783 (Cal.2005).  Factors beyond the minimum elements of the crime include, *inter alia*, that "[t]he offense was carried out in a dispassionate and calculated manner," that "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and that "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Cal.Code. Regs., tit. 15 § 2402(c)(1)(B), (D)-(E)."

7   Irons at 663; see also In re Weider, 145 Cal.App.4th 570, 588 (2006) (to support denial of parole,

8   the "factors beyond the minimum elements of the crime" "must be predicated on "some evidence

9   that the particular circumstances of [the prisoner's] crime-circumstances beyond the minimum

10   elements of his conviction-indicated exceptional callousness and cruelty with trivial provocation,

11   and thus suggested he remains a danger to public safety.")

12          In California, "[s]econd degree murder is defined as the unlawful killing of a

13   human being with malice aforethought, but without the additional elements--i.e., willfulness,

14   premeditation, and deliberation-that would support a conviction of first degree murder." People

15   v. Nieto Benitez, 4 Cal.4th 91, 102 (1992).  "Malice, for the purpose of defining murder, may be

16   express or implied.  (§ 188.)  It is express 'when there is manifested a deliberate intention

17   unlawfully to take away the life of a fellow creature.'  (§ 188; People v. Mattison (1971) 4 Cal.3d

18   177, 182, 93 Cal.Rptr. 185, 481 P.2d 193.)  Implied malice is present "when no considerable

19   provocation appears, or when the circumstances attending the killing show an abandoned and

20   malignant heart." (§ 188; People v. Mattison, supra.)."  Id. at 102-103.

21          Under California law,

22
23
24
25

"all second degree murders by definition involve some callousness – i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others.  [Citation.]  As noted, however, parole is the rule, rather than the exception, and a conviction for second degree murder does not automatically render one unsuitable."  (In re Smith (2003) 114 Cal.App.4th 343, 366.)
. . . .

26   /////

17

> Therefore, to demonstrate 'an exceptionally callous disregard for human suffering' [within the meaning of applicable provisions of the California parole statutes], the offense in question must have been committed in a more aggravated or violent manner than that ordinarily shown in the commission of second degree murder.

In re Scott, 119 Cal.App.4th 871, 891 (2004).  Such circumstances may include "rehearsing the murder, executing of a sleeping victim, stalking," id., or evidence that the defendant "acted with cold, calculated, dispassion, or that he tormented, terrorized or injured [the victim] before deciding to shoot her; or that he gratuitously increased or unnecessarily prolonged her pain and suffering."  In re Smith, 114 Cal.App.4th at 367.

Similarly, in In re Scott the court noted that a finding of "triviality" sufficient to justify the denial of parole must also relate to present dangerousness:

> The offense committed by most prisoners serving life terms is, of course, murder. Given the high value our society places upon life, there is no motive for unlawfully taking the life of another human being that could not reasonably be deemed "trivial." The Legislature has foreclosed that approach, however, by declaring that murderers with life sentences must "normally" be given release dates when they approach their minimum eligible parole dates. (Pen.Code, § 3041, subd. (a).) The governing statute also states that the Board shall set a release date "unless it determines that the gravity of current convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Pen.Code, § 3041, subd. (b).) This language means a "more lengthy period of incarceration" is called for where the gravity of the offense or offenses of the prisoner in question is more indicative of a danger to the public if the prisoner is released than would ordinarily be the case.  The reference in Board regulations to motives that are "very trivial in relationship to the offense" therefore requires comparisons; to fit the regulatory description, the motive must be materially less significant (or more "trivial") than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily presented.

In re Scott, 119 Cal.App.4th 871, 893 (2004).

/////

/////

1    Here, the Board described the offense as

2    carried out in an especially cruel manner.  It was carried out in a
     manner which demonstrates a callous disregard for human
3    suffering and the motive for the crime was inexplicable or very
     trivial in relation to the offense.
4

5    (Ex. B to Answer, at 28.)  These facts do not support a finding that the commitment offense was

6    committed in a "more aggravated or violent manner" than other second degree murders, and

7    review of the record reveals no evidence that petitioner's commitment offense was carried out

8    with the type of gratuitous violence, torture or disregard for the victim that would permit it to be

9    defined as "especially callous" as that term has been defined by the California courts.

10         The record before this court shows facts congruent with those described in the

11   state court's denial of petitioner's appeal.  The facts suggest that petitioner was, at the time of the

12   commitment offense, inebriated and angry.  Petitioner shot the weapon three times, but only hit

13   the victim once.  Moreover, while petitioner immediately left the scene, he ultimately phoned the

14   police, and, although he claims he shot the victim in self-defense, he has acknowledged

15   responsibility for killing the victim.

16         The record before the Board and before this court does show facts sufficient to

17   support petitioner's conviction for second degree murder based on a finding of implied malice in

18   that "no considerable provocation" appeared for the actions that petitioner took which led to the

19   death of the victim.  The record does not, however, show any facts which suggest that the

20   circumstances of the commitment offense were sufficiently callous, or the motive for petitioner's

21   actions sufficiently trivial, that twenty-two years after the offense the circumstances of the

22   commitment offense would still suggest that petitioner remained a danger to society.[5]  Absent

23

24         [5]  The Board also referred to petitioner's use of alcohol at the time of the offense.  It is
     unclear, because the Board did not elaborate, how this finding relates in any way to a
25   determination concerning the callousness of the offense or the trivialness of the motivation.
     Moreover, the record amply demonstrates that petitioner's history of alcohol abuse has been in
26   remission for years.

1    such facts, the Board's reliance on petitioner's criminal conviction to support the denial of parole

2    violates petitioner's right to due process.

3         In addition, the Board's characterization of Dr. Carswell's report as not totally

4    supportive of petitioner's release on parole misstates the report.  Dr. Carswell stated that should

5    petitioner be released on parole, Dr. Carswell expected petitioner would be able to maintain his

6    present gains in the community.  (Lodged Documents, at 79 [docket no. 14-3.])  His

7    dangerousness upon release to the community was assessed as only slightly higher than the

8    average citizen in the community.  (Id.)  And, while a return to alcohol was identified as a

9    significant risk factor, petitioner's record demonstrates his commitment to AA.  His lack of

10    prison disciplinaries, including any reference to alcohol use or abuse while incarcerated, supports

11    that AA commitment.

12         Moreover, review of Dr. Carswell's report fails to proffer support for the Board's

13    finding that there "is a need for a longer period of observation and evaluation or treatment" or

14    that petitioner "has not completed programming which is essential to his adjustment and needs

15    additional time to gain that programming." (Respondents' Ex. B, at 31.)  Indeed, Dr. Carswell

16    stated petitioner "has no mental health disorder which would necessitate treatment, either during

17    his incarceration period or after parole."  (Lodged Documents at 79 [docket no. 14-3].)

18         The correctional counselor's view that petitioner is required to submit to anger

19    management therapy is refuted by at least three psychologists who unequivocally found petitioner

20    had no need for therapy.  Here, petitioner's model behavior in prison demonstrates that he does

21    not presently have an anger management problem; he has sustained no prison disciplinaries for

22    fights or anger problems, and his work records, mostly satisfactory or above, do not demonstrate

23    petitioner has an anger problem.  Petitioner has been essentially disciplinary-free throughout his

24    twenty-two year tenure in prison, and has no pre-offense record of violence or anger management

25    problems.  After review of the record, this court finds there is no evidence to support the

26    /////

1    correctional counselor's position that petitioner should be required to attend anger management

2    therapy.

3           Given the psychological evaluations, petitioner's work history while in prison, as

4    well as his prior vocation as a tailor and watch and jewelry repairman, this court finds no

5    evidence to support the Board's position that petitioner needs more self-help programming or to

6    complete a vocation.  Petitioner has faithfully attended AA, which is the self-help program most

7    connected to the commitment offense.  There is nothing in the record to demonstrate he needs

8    additional counseling in the prison setting in order to demonstrate that he can maintain his gains

9    in society.

10          Prison officials viewed the fact that petitioner was carrying a concealed weapon

11   during the commitment offense and had illegally entered the United States as a form of criminal

12   history.  However, the weapon was part of the crime charged and should not be counted twice

13   against petitioner.  Insofar as petitioner's illegal alien status, there is an INS hold on petitioner

14   suggesting he will be deported upon his release from state prison.  Both of these facts are also

15   unchanging factors upon which prison officials may not continue to rely in denying petitioner

16   parole where he does not pose an unreasonable risk of danger to the community.

17          Finally, petitioner has evidenced remorse for his commitment offense.

18   (Respondent's Ex. B, at 7, 22.)  Although petitioner continues to characterize his crime as self-

19   defense, he has accepted responsibility for taking the victim's life.  Petitioner acknowledges he

20   would do something very different today.  (Id. at 22.)  The Board's reliance on petitioner's failure

21   to accept responsibility violated California Penal Code § 5011(b).  Id.[6]

22   /////

23   /////

24

25         [6] California Penal Code § 5011(b) provides: "The Board of Prison Terms shall not
     require, when setting parole dates, an admission of guilt to any crime for which an inmate was
26   committed."

1        Petitioner is now 65 years old and has served 22 years in state prison.  He has

2 obtained a GED and has vocational skills that would provide him the means to support himself.[7]

3 He has family members, both in the United States and in Mexico, who have offered their support

4 and would be willing to allow him to live with him should he be paroled.  (Lodged Documents,

5 at 10-22; 25-83 [docket no. 15-5.]; Respondent's Ex. B, at 17; Traverse at 10.)

6        The instant case is similar to Hayward in that (1) petitioner has served twenty-two

7 years in prison on a sentence of seventeen years to life; (2) the petitioner is sixty-five years old;

8 (3) petitioner has solid parole plans, including a place to live and employment options; and (4)

9 petitioner has had an "exemplary" prison record for most of his period of incarceration, with only

10 one minor disciplinary violation taking place in 1997.

11        Petitioner's commitment offense could be a sufficient basis to deny his parole if it

12 indicated a risk of re-offending and a danger to society.  It does not.  Whether petitioner is

13 currently dangerous enough to society to preclude his parole depends on whether his judgment is

14 likely to fail him as gravely as it did when he drank to excess and shot a stranger at a bar.  By

15 itself, however, petitioner's exercise of poor judgment twenty-two years ago is not probative,

16 absent any more recent indicators, of his exercise of poor judgment again at his age of 65.

17 Petitioner's positive prison record over the past two decades indicates that he is suitable for

18 parole.

19        Similar to the conclusion reached by the Ninth Circuit in Hayward, this court

20 rejects the Board's reliance on the gravity of petitioner's commitment offense or alcohol abuse to

21 deny parole on this record.  Given petitioner's rehabilitation, and model conduct while in prison,

22 the court finds that his commitment offense, which occurred twenty-two years ago, does not

23 demonstrate that his release will pose an imminent danger to public safety.  Moreover, the court

24

25        [7]  Petitioner argues that the Board's requirement that he obtain a vocation or upgrade educationally "defies reality and reason" particularly for an "aged foreign prisoner."  (Traverse at

26 10.)  Petitioner is 65, near retirement age, and has chronic back problems, high blood pressure and other medical issues that limit his ability to work.  (Id.)

1  finds that under the circumstance presented by this case the Board's reliance on these "stale and

2  static factor[s]" to deny parole after his minimum term has expired violates petitioner's due

3  process rights.  See Hayward, 512 F.3d at 546-47; cf. Irons, 505 F.3d at 846 ("due process was

4  not violated when these prisoners were deemed unsuitable for parole prior to the expiration of

5  their minimum terms").

6          In addition, the Board's continued reliance on unchanging factors to deny

7  petitioner parole violated petitioner's right to due process.  Biggs v. Terhune, 334 F.3d 910, 917

8  (9th Cir. 2003)("A continued reliance in the future on an unchanging factor, the circumstance of

9  the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused

10  by the prison system and could result in a due process violation.")  This court has reviewed the

11  record and determined that the record lacked some evidence supporting the Board's denial of

12  parole.  For all of these reasons, the writ should be granted.

13          In accordance with the above , IT IS HEREBY RECOMMENDED that:

14          1.  Petitioner's application for a writ of habeas corpus be granted; and

15          2.  Respondents be directed to forthwith set a parole release date for petitioner.

16          These findings and recommendations are submitted to the United States District

17  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days

18  after being served with these findings and recommendations, any party may file written

19  objections with the court and serve a copy on all parties.  Such a document should be captioned

20  "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that

21  failure to file objections within the specified time may waive the right to appeal the District

22  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

23  DATED:  May 28, 2008.

24

25                                    UNITED STATES MAGISTRATE JUDGE

26  001; leon2631.157