IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CELSO LEON,

   Petitioner,       No. CIV S-04-2631 FCD JFM P

  vs.

A. P. KANE, Warden, et al.,

   Respondents.    <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

   Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is serving a sentence of 15 years to life, plus a two year enhancement, following his 1986 conviction on charges of second degree murder with the use of a firearm.  Petitioner challenges the January 23, 2001 decision of the California Board of Prison Terms (Board) to deny him a parole date.  Petitioner contends that he was deprived of a constitutionally protected liberty interest without sufficient evidence; that the Board abused its discretion by its arbitrary and capricious use of its regulations; and that the Board violated his right to due process by applying the "some evidence" standard in a manner contrary to law or by an unreasonable application of established Supreme Court authority.

PROCEDURAL HISTORY

   1.  The decision to deny parole became final on February 16, 2001.  Petitioner filed an appeal.  (Answer, Ex. D.)  The appeal was denied with one exception – because the

1

psychological reports did not include evidence petitioner suffers from any mental health issues,

the parole decision was modified by removing all references to therapy.  (Id.)  The appeals unit

found that there was ample evidence to support the unsuitability finding.  (Id.)

       2.  On May 8, 2002, petitioner filed a petition in the Fresno County Superior

Court challenging the Board's decision.  Respondents believe that petition was denied.

       3.  Petitioner filed a petition for writ of habeas corpus in the Court of Appeal,

Fifth Appellate District, which was summarily denied on July 29, 2004.  (Answer, Ex. F.)

       4.  Petitioner's petition for review was denied by the California Supreme Court on

October 20, 2004, en banc and without comment.  (Answer, Ex. F.)

       5.  Petitioner filed the instant action on December 13, 2004.

STATEMENT OF FACTS[1]

On the night of August 8, 1985, Manuel DeLeon (DeLeon) was shot and killed at the Mexico Café in Parlier.  Augustine Morales testified he had been working with DeLeon and accompanied him to the bar in order to use the bathroom.  When Morales emerged from the bathroom, he saw DeLeon talking to two or three other men whom he could not identify.  At some point in the evening Morales was struck and carried from the bar, and as he was being carried out, he heard gunshots.  Morales did not overhear any of the discussion between DeLeon and the other men because of the noise in the bar.

Pedro DeLeon (Pedro), a cousin of DeLeon's, was in the Mexico Café when DeLeon came in.  Pedro observed DeLeon talking with Morales and with [petitioner].  He also saw [petitioner] strike Morales, causing him to fall against the pool table.  DeLeon tried to intervene.  [Petitioner] shot at DeLeon from a distance of about three steps and ran from the scene.  Pedro heard three shots fired.  DeLeon had no weapon; [petitioner] had removed a gun from his own waistband.  Pedro testified there were two other men with [petitioner] that evening, who might have been a father and son; one of these men tried to push [petitioner's] hand up to prevent him from shooting DeLeon.  Pedro never saw DeLeon hit [petitioner], nor did he ever see [petitioner] fall to the ground.

---

[1] The facts are taken from the opinion of the California Court of Appeal for the Fifth Appellate District in People v. Leon, No. F007213 (December 1, 1987), a copy of which was lodged as Exhibit #4 to Respondent's Response on May 5, 2008.

Manuela Lopez, a waitress in the Mexico Café on the night of August 8, 1985, saw DeLeon talking to [petitioner] before any shots were fired.  Lopez identified [petitioner] in the courtroom.  Lopez had seen [petitioner] arrive in the bar that evening accompanied by three adults and a young boy.  Lopez refused to serve any of the adults because of the presence of the boy, and when [petitioner] insisted on service, Lopez went to talk to the manager.

When Lopez saw [petitioner] and DeLeon talking, she feared there might be a fight because [petitioner] appeared to be angry.  She was on her way toward the men when the shots were fired.  Lopez heard DeLeon "like as if he were saying to forgive him" and [petitioner] "just took out the pistol and fired it" towards DeLeon from about three or four feet away.  A boy or young man who was with [petitioner] tried to hold him, but [petitioner] pushed him away.  Lopez testified DeLeon had no weapon in his hands nor did Lopez see any weapon near the body when she turned DeLeon over because he appeared to be choking.  Lopez did not see anyone hit or kick [petitioner], and she never saw [petitioner] fall to the floor.

Sergio Garcia, who was with DeLeon in the Mexico Café on August 8, saw DeLeon get into an argument with [petitioner] and Morales.  Garcia identified [petitioner] in the courtroom and testified he had previously seen [petitioner] in the nearby jewelry store which [petitioner] owned.  [Petitioner] was with his son, Pete, and another man they called "Guerro."  Garcia thought the argument had started when Morales bumped into [petitioner].  DeLeon moved closer to [petitioner] after the bumping incident but had no weapon.  [Petitioner] struck Morales, and DeLeon "threw a gloved fist at [petitioner]."  Garcia never saw DeLeon kick [petitioner].

Adan Buenrostro, the bartender in the Mexico Café, heard the gunshots fired the night of August 8 and, after hearing the shots, saw [petitioner] with a gun in his hand.  Buenrostro saw [petitioner] leave the bar.  Buenrostro knew [petitioner] from the bar and the adjacent Corral Café, and he knew [petitioner] had a jewelry store.  Buenrostro testified he knew [petitioner] to be nonviolent when he was sober but had heard [petitioner] would get into fights with friends when he was drunk.  Maria Trejo, the cashier at the Mexico Café, looked toward the bathroom in time to see [petitioner] draw his weapon.  She yelled to Buenrostro just as she heard the shots fired.  Trejo never saw [petitioner] knocked to the floor before the shooting.

Francisco Mejia was outside the Mexico Café when he heard shots fired.  He saw [petitioner] run out of the bar and recognized [petitioner] from prior businesses [petitioner] had operated; Mejia saw [petitioner] get into his car and leave the area with tires squealing.  As [petitioner] left, he bumped into Mejia's car.

3

[Petitioner] was driving a green car, high in the back, with a "For Sale" sign on it.

Detective Joe Rascon, who had been assigned to investigate the homicide, conducted a search for a green two-door Dodge and found the car in the early morning hours of August 9, apparently abandoned in the area of Manning and McCall Avenues. Shoe tracks led from the vehicle to the intersection. James Tarver, a criminalist with the sheriff's department who participated in the investigation, testified that a pair of light tan half-boots with a pointed toe seized in a search of [petitioner's] residence shared positive class characteristics (size, sole size, and sole design) with the tracks leading from the vehicle. Tarver could not say positively that the shoes seized from [petitioner's] house had left the prints at the scene, but they certainly could not be excluded. The abandoned Dodge car in question had been lent to [petitioner] by Gabriel Torres who recovered the car from the police impound yard.

When police officers responded to the scene of the Mexico Café, DeLeon was found lying on the floor in a pool of blood and showed no signs of life. Homicide detective Scott Morrison later checked the bar for two rounds of ammunition which had not been found in the body. He found one embedded about 18 inches from the floor in a stack of beer cans and the other embedded in the ceiling. Detective Pete Chavez, designated the investigating officer on the case, testified that he had interviewed Sergio Garcia in Spanish at the time of the homicide and, although Garcia told Chavez that [petitioner] had struck DeLeon, he said nothing about DeLeon hitting [petitioner]. Chavez also interviewed Augustine Morales, who stated he had been present during the shooting. Morales told Chavez he heard [petitioner] cursing at DeLeon, and when Morales approached and asked what was going on, [petitioner] struck him and told him to shutup. [Petitioner] then told DeLeon he was "gutless." Morales saw [petitioner] with a gun and heard the shots.

Dr. Jerry Nelson, a pathologist, testified that the autopsy revealed DeLeon died as the result of a single gunshot wound entering the front of the neck at an angle of 5 degrees upward and 10 degrees to the right, assuming the victim was standing vertically on flat ground. The wound caused massive hemorrhage and asphyxia since it passed through the larynx. The bullet struck the fourth and fifth cervical vertebrae and penetrated the left side of the spinal cord, partially severing it and throwing the victim into deep shock.

<u>Defense Case</u>

Homero Salinas testified that he had driven to Parlier on August 8 with his brother and his three-year-old son in order to see Pete Leon and talk to him about acting as godfather at a baptism. At about 6 p.m., Salinas went to the jewelry store owned by [petitioner] and Pete; he stayed there talking until 10 p.m. when the three left to go to the Mexico Café for some dinner. At some point Salinas and Pete went to the bathroom, and as they emerged they

saw [petitioner] walking toward them.  Three men were following him.  [Petitioner] stopped when he encountered Salinas and Pete, and Salinas went and ordered three more beers.  The three men were then surrounding [petitioner] , and one of the three tried to pick a fight, stating "I'm going to kick your ass."  Salinas testified [petitioner] never swore at DeLeon and instead expressed a desire to leave the bar.  Pete tried to intervene.  The man who had threatened to kick [petitioner's] ass put his hand on Pete's face and pushed him back.  [Petitioner] again tried to leave, but as he started walking away, another of the three struck [petitioner] twice in the back of the head.  [Petitioner] fell to the ground, he was struck again in the face, and the man who had struck him began to kick him in the side.  Salinas and Pete restrained the other two men to prevent them from joining into the fight.  Salinas heard shots fired and ran from the bar.

[Petitioner] testified on his own behalf; his testimony was basically consistent with that of Homero Salinas.  [Petitioner] testified that after he had been knocked to the floor, one of his assailants kicked him, beat him in the face, and then placed his knee on [petitioner's] chest.  [Petitioner] became short of breath and feared that the man was going to kill him.  [Petitioner] then recalled he was carrying a pistol since he was wearing about $12,000 worth of jewelry which he had not wanted to leave in the jewelry store; he pulled the gun from his waistband.  He fired upward at about a 45 degree angle, and the first two shots he fired were intended to frighten his assailant.  [Petitioner] saw that the third shot he fired struck the assailant; he testified he had not wanted to do this and only shot out of fear that he was going to be killed.  [Petitioner] started to drive home but the car stalled; he then called his son, Pete.  Pete took [petitioner] home, where [petitioner] had a couple of beers to calm down and then called the police from a neighbor's house to report his car stolen.  [Petitioner] testified, "it was a way of turning myself in, because I did not want to flee, because I knew that I had done a wrong thing."

(People v. Leon, slip op. at 2-7)

## ANALYSIS

### I. Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

/////

1    (2) resulted in a decision that was based on an unreasonable
     determination of the facts in light of the evidence presented in the
2    State court proceeding.

3    28 U.S.C. § 2254(d).

4           Under section 2254(d)(1), a state court decision is "contrary to" clearly

5    established United States Supreme Court precedents if it applies a rule that contradicts the

6    governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

7    indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

8    result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406

9    (2000)).

10          Under the  "unreasonable application" clause of section 2254(d)(1), a federal

11   habeas court may grant the writ if the state court identifies the correct governing legal principle

12   from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

13   prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

14   simply because that court concludes in its independent judgment that the relevant state-court

15   decision applied clearly established federal law erroneously or incorrectly.  Rather, that

16   application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, __ U.S. __, 123

17   S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent review

18   of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

19          The court looks to the last reasoned state court decision as the basis for the state

20   court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

21   reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

22   habeas court independently reviews the record to determine whether habeas corpus relief is

23   available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

24   II.  Petitioner's Claims

25          The January 23, 2001 decision challenged herein was made at a subsequent parole

26   consideration hearing.  (See Exhibit B to Answer to Petition for Writ of Habeas Corpus, filed

6

February 23, 2005.)  In its decision, the Board concluded that petitioner was not suitable for

parole and "would pose an unreasonable risk of danger to society or a threat to public safety if

released from prison." (Ex. B to Answer, at 28.)  The Board relied principally on petitioner's

commitment offense.  (Id.)  The Board noted petitioner did not have an arrest or a conviction

record, but admitted to coming to the United States illegally and carrying a concealed weapon

without a permit. (Ex. B to Answer, at 29.)  The Board found petitioner had "not yet sufficiently

participated in beneficial self-help []² programming."  (Id.)

The Board found the psychological report of Dr. M. Carswell "not totally

supportive of release."  (Id.)  Although the report stated petitioner showed good insight into his

commitment offense, the Board was concerned that petitioner's "recollection of the events are

nowhere near what the jury heard or the appellate court heard or the presiding judge or what

witnesses said."  (Id.)  While the report concluded petitioner had a violence potential estimated to

be only slightly higher than the average citizen in the community, the Board found that it was

slightly higher based on the significant risk factor that if petitioner returned to alcohol, his

dangerousness would increase.  (Id.)  The correctional counselor found petitioner would "pose a

moderate degree of threat if released to the public."  (Id. at 30.)

The Board noted petitioner has an INS hold but has residential plans if paroled to

Mexico. (Id. at 29.)  However, petitioner did not have proof of employment plans.  (Id.)

The Board commended petitioner for being disciplinary-free since 1997, and

noted he had only received one 115 which he received in 1997.  (Id.)  Petitioner had

> been in AA for quite a while, took a parent education program and
> then took some courses in transmitted diseases, Hepatitis, TB and
> sexually transmitted diseases and he also has a laudatory chrono
> for his progress in the graphic arts offset printing vocation where
> he has completed some of the units towards that vocation.

(Id. at 30.)

---

² The words "and therapy" were ordered removed pursuant to the appeals unit.  (Answer,
Ex. D.)

Ultimately, the Board found those positives did not outweigh the following factors:  his commitment offense which was carried out in an especially cruel manner; a recent psychological report which demonstrated a need for a longer period of observation and evaluation or treatment; petitioner had not completed programming essential to his adjustment and needed additional time to gain that programming; and he needed to more fully participate in self-help programming and to complete a vocation.  (Id. at 30-31.)

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts, see Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.1985), and is unavailable for alleged errors in the interpretation or application of state law, see Lewis v. Jeffers, 497 U.S. 764, 780 (1990).  For this reason, petitioner's claims arising out of alleged violations of state law are not cognizable in this federal habeas corpus action.

California's statutory scheme governing parole "creates in every inmate a cognizable liberty interest in parole which is protected by the procedural safeguards of the Due Process Clause." Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); see also Sass v. California Board of Prison Terms, 461 F.3d 1123, 1127-28 (9th Cir. 2006).

> [T]he Supreme Court ha[s] clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by "some evidence in the record," Sass, 461 F.3d at 1128-29 (citing Superintendent v. Hill, 472 U.S. 445, 457, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)); see also Biggs, 334 F.3d at 915 (citing McQuillion, 306 F.3d at 904), or is "otherwise arbitrary," Hill, 472 U.S. at 457, 105 S.Ct. 2768.

Irons v. Carey, 505 F.3d 846, 851 (9th Cir. 2007).

> California law allows the Board to consider a myriad of factors when weighing the decision of granting or denying parole. Parole may be denied if the Board "determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for [the] individual."  Cal. Penal Code § 3041(b).

1  Biggs, at 915.

2        The regulations governing the parole process provide six
      nonexclusive factors tending to show unsuitability for parole and
3        nine nonexclusive factors tending to show suitability. The factors
      tending to show unsuitability are:  (1) Commitment Offense; (2)
4        Previous Record of Violence; (3) Unstable Social History; (4)
      Sadistic Sexual Offenses; (5) Psychological Factors; and (6)
5        Institutional Behavior. 15 Cal.Code Regs. § 2402(c). In terms of
      the first factor, "Commitment Offense," the regulations explain
6        that it tends to show unsuitability when "[t]he prisoner committed
      the offense in an especially heinous, atrocious or cruel manner." Id.
7        at § 2402(c)(1). The factors indicating suitability for parole are: (1)
      No Juvenile Record; (2) Stable Social History; (3) Signs of
8        Remorse; (4) Motivation for the Crime; (5) Battered Woman
      Syndrome; (6) Lack of Criminal History; (7) Age; (8)
9        Understanding and Plans for the Future; and (9) Institutional
      Behavior. 15 Cal.Code Regs. § 2402(d).

10

11  Irons, 505 F.3d at 851 n.4.  "Even though these suitability and unsuitability factors are helpful in

12  analyzing whether a prisoner should be granted parole, California courts have made clear that the

13  'findings that are necessary to deem a prisoner unsuitable for parole,' Irons, 505 F.3d at 850,

14  require additional evidence beyond the elements of the commitment offense that demonstrate the

15  prisoner's release will unreasonably endanger public safety.  Irons at 663, quoting In re

16  Dannenberg, 34 Cal.4th 1061, 1071, 23 Cal.Rptr.3d 417 (Cal. 2005); see also In re Weider, 145

17  Cal.App.4th 570, 588 (2006) (to support denial of parole, the "factors beyond the minimum

18  elements of the crime" "must be predicated on "some evidence that the particular circumstances

19  of [the prisoner's] crime-circumstances beyond the minimum elements of his conviction-

20  indicated exceptional callousness and cruelty with trivial provocation, and thus suggested he

21  remains a danger to public safety.")

22        Petitioner claims that there was no evidence to support application of any of the

23  unsuitability factors to him, that there was substantial evidence to support application of several

24  of the suitability factors to him, and that the evidence showed he would pose very little danger to

25  the community if released.

26  /////

1    Petitioner was received in state prison on March 26, 1986 following his December

2  26, 1985 conviction for second degree murder while armed with a firearm.  (Ex. A to Answer.)

3  Petitioner was sentenced to an indeterminate term of fifteen years to life in prison, plus two years

4  for the weapons enhancement.  (Id.)  Petitioner's initial parole consideration hearing was held on

5  April 30, 1996, at which time parole was denied for a period of two years.  (Ex. B to Answer, at

6  1.)  The Board's January 23, 2001 decision was petitioner's fourth denial of parole.  (Traverse at

7  4.)  Petitioner's bid for parole has been denied two more times since.  (Id.)

8    As noted above, the Board relied principally on petitioner's commitment offense

9  and the finding that he poses a significant risk to the community if he resumes his alcohol

10  consumption.  The record reflects that there was some evidence before the Board to support the

11  description of petitioner's commitment offense.  Petitioner claims that this factor alone is

12  insufficient to support a finding of present dangerousness required to justify the denial of parole.

13  Specifically, petitioner contends that he has been disciplinary-free since 1997 and that the

14  evidence showed he poses little threat to the community.  Moreover, petitioner contends there is

15  no evidence to support the Board's finding that he presents a significant risk based on his prior

16  alcohol abuse.  Petitioner argues he has attended AA for many years and has suffered no prison

17  disciplinaries for alcohol or substance use during his 22 years of incarceration.  (Traverse at 19.)

18    The record before the Board at the time of the 2001 hearing contains substantial

19  evidence contrary to the Board's conclusion that petitioner "would pose an unreasonable risk of

20  danger to society or a threat to public safety if released from prison."  In Dr. Carswell's 2000

21  psychological evaluation, petitioner noted he had attended AA for 20 years and had been sober

22  for 16 years.  (Lodged Documents at 78 [docket no. 14-3].)  The Axis I diagnostic impression

23  was alcohol abuse, in institutional remission.  (Id.)  "Should this inmate at this time be given a

24  parole or release date, it is expected he will be able to maintain his present gains in the

25  community."  (Id. at 79.)  The psychological evaluation assessed his level of dangerousness as

26  follows:

> A.  Considering the fact this inmate has not had a CDC-115 violation since 1987 [sic], he would be considered a less than average risk for violence when compared to this Level II inmate population.
>
> B.  If released to the community, his violence potential is estimated to be only slightly higher than the average citizen in the community.
>
> C.  Obviously, the most significant risk factor as a precursor to violence for this inmate would be a return to the use of alcohol.

(Id. at 79.)  Petitioner described his commitment offense to the psychologists as follows:

> the crime was in self-defense.  There was a problem with the victim and his son.  He did not know the victim and states that he is very sorry about what happened, that today he would have done something very different, and that he prays every day for everyone in his family and the victim's.  He also stated that the judge had some questions and was wavering while considering his guilt or innocence, and finally decided that the inmate was guilty.

(Id. at 79.)  Dr. Carswell made the following observations, comments and recommendations:

> A.  This inmate is responsible for his behavior.  He has the ability to abide by institutional standards and has generally done so during his incarceration period.
>
> B.  This inmate has no mental health disorder which would necessitate treatment either during his incarceration period or after parole.
>
> C.  Since this inmate appears to have an alcohol problem, periodic alcohol and drug testing as a mandatory part of parole is recommended.

(Id. at 79-80.)

Petitioner's classification score was reduced to zero on March 17, 1994.  (Id. at 5 [docket no. 15-3].)  His classification score remained zero as of April 2000.  (Id. at 90 [docket no. 15-5.])

At his March 10, 1993 classification hearing, it was noted that petitioner was medically inhibited due to back problems.  (Id. at 9 [docket no. 15-3; see also id. at 22 [docket no. 15-3.])  The 1994 Life Prisoner Evaluation Report noted petitioner had a CDC 128-C dated August 11, 1994 noting petitioner's chronic low back pain.  (Id. at 109 [docket no. 15-5.])

11

1    At his May 3, 2000 annual classification hearing, petitioner was assigned to

2   vocational print shop.  (Id. at 11 [docket no. 15-3].)  Petitioner had "two periods of average or

3   above performance in work, school or Vocational Program."  (Id.)  Petitioner had been assigned

4   to the Vocational Print Shop since January 5, 1999 with satisfactory ratings.  (Id. at 91 [docket

5   no. 15-5.])  In 1998, petitioner worked in culinary.  (Id. at 13 [docket no. 15-3.])  Petitioner was

6   previously employed as a tailor and watch and jewelry repairman.  (Id. at 22 [docket no. 15-3.];

7   see also id. at 87 [docket no. 15-5.])  At the time of his commitment offense he had a jewelry

8   store in the Fresno area in partnership with his son.  (Id. at 20 [docket no. 15-6.])

9    Petitioner has been informed that the Foreign Prisoner Transfer Treaty Program

10   (FPTTP) applies and he could complete his sentence in Mexico, but petitioner declined stating he

11   has family residing in California.  (Id. at 15 [docket no. 15-3.])

12    Petitioner has received no serious rules violation reports since he was

13   incarcerated.  In 1997, petitioner's received an administrative 115 for alteration of state material.

14   (Id. at 20 [docket no. 15-3.]; see also id. at 94 [docket no. 15-5.])

15    Petitioner started attending Alcoholics Anonymous in April or May of 1991.  (Id.

16   at 5 [docket no. 15-6.])  Petitioner had 100% attendance from May 1991 through June 1991.  (Id.

17   at 6.)  A May 6, 1992 128B chrono shows petitioner had a 94% attendance at Level III Hispanic

18   AA group from May 8, 1991 to May 6, 1992.  (Id. at 6 [docket no. 15-6.])  Petitioner's central

19   file contains confirmation of petitioner's active participation in AA from July 1992 through

20   December 1992, having attended 28 of 28 meetings held.  (Id. at 26, 44 [docket no. 15-4.])

21   Petitioner participated in AA as documented by CDC 128B's dated February 24, 1994, May 24,

22   1994, October 21 & 26, 1995, December 22, 1995, October 29, 1996, August 29, 1997, February

23   24, 1998, August 1, 1998, September 30, 1998, December 29, 1998, April 7, 1999, July 6, 1999,

24   and September 30, 1999 and January 21, 2000.  (Id. at 2-3 [docket no. 15-6], 107, 103-04, 95-97

25   docket no. 15-5.])  The December 29, 2000 addendum to the parole consideration hearing states

26   that petitioner participated in AA "as documented on CDC 128B dated 5-2-00, 1-21-00, and 9-

1  30-99." (Id. at 89 [docket no. 15-5.])  The Life Prisoner Evaluation Report, dated April 2000,

2  states petitioner "is a current member of Alcoholics Anonymous and has been a member since

3  October 1993." (Id. at 91-92 [docket no. 15-5.])

4          Petitioner was assigned to Education as an ESL student from October 5, 1996

5  February 2, 1998, and received satisfactory ratings.  (Id. at 92 [docket no. 15-5.])  Petitioner

6  received his GED.  (Id. at 95 [docket no. 15-5.])  He was assigned to Lunch Box Crew from

7  February 21, 1998 to October 1, 1998, with satisfactory ratings.  (Id. at 92 [docket no. 15-5.])

8  Petitioner received a completion certificate for the Parent Education Program, (id. at 40-42

9  [docket no. 15-4]), and a certificate of achievement for his completion of the Reading Levels A

10  & B of the PLATO computer assisted learning program.  (Id. at 43.)

11          Despite petitioner's model behavior in prison and his continued participation in

12  AA, Correctional Counselor Baker wrote in the April 2000 Life Prisoner Evaluation Report:

13          Considering the commitment offense, prior record and prison
         adjustment, this writer believes the prisoner would pose a moderate

14          degree of threat to the public at this time, if released from prison.
         [Petitioner's] crime consisted of the 1985 shooting of a man during

15          an altercation.  [Petitioner] was intoxicated and seems to have
         become disproportionately angry during the incident.  What

16          concerns this writer is that the victim was attempting to apologize
         to [petitioner] for having brushed against him when he (the victim)

17          was fatally shot for no apparent reason.  [Petitioner's] version of
         the story:  that he shot the victim out of self-defense is not

18          substantiated by the available facts of record.  It is my opinion,
         should [petitioner] return to using drugs (alcohol), his degree of

19          threat to the public would be much higher, therefore, it is
         recommended that he continue to participate in Alcoholics

20          Anonymous and Narcotics Anonymous.  In addition, [petitioner]
         could benefit from anger control therapy since the crime was a

21          direct result of anger under the influence of alcohol, as indicated in
         the previous report.

22

23  (Id. at 92 [docket no. 15-5.])

24          This report stands in contrast to the psychological evaluation issued January 2,

25  1998, which states petitioner "does not have a mental health disorder which would necessitate

26  treatment either during his incarceration period or following parole."  (Id. at 15 [docket no. 15-

6.])  Dr. Terrini stated petitioner "demonstrated some insight into his commitment offense and

his judgment appeared to be normal."  (Id. at 14 [docket no. 15-6.])  Dr. Terrini concluded:

> 1)  [Petitioner] is competent and responsible for his behavior.  He
> has the capacity to abide by institutional standards and has
> generally done so during his incarceration.
>
> 2)  Given his lack of a criminal history, his lack of a violent
> criminal history, his relative lack of CDC-115s and his lack of
> violent CDC-115s, his violence potential is estimated to be below
> average relative to this inmate population.
>
> 3)  As [petitioner] apparently had an alcohol problem, monitoring,
> as well as attendance at Alcoholics Anonymous, should be
> mandatory conditions of parole.
>
> 4)  [Petitioner] does not have a mental health disorder which would
> necessitate treatment either during his incarceration period or
> following parole.

(Id. at 15 [docket no. 15-6.])  Dr. Kitt, in his 1994 psychiatric evaluation stated that "[a]lthough

the possibility of alcohol abuse may have existed at [the time of the offense], it is not a current

problem."  (Id. at 18 [docket no. 15-6.])  He opined,

> There is no relationship between any psychopathology and the
> criminal behavior.  While incarcerated [petitioner] has
> psychiatrically improved slightly due to increasing age and
> possible benefits of attending Alcoholics Anonymous meetings.  In
> a less controlled setting such as a return to the community, he is
> likely to maintain his gains."
> . . .
>
> He is not in need of any psychotherapy.

(Id. at 18 [docket no. 15-6.])  These reports track an even earlier psychological evaluation, dated

July 21, 1989, where Dr. Davis concluded:

> A major mental disorder was not a factor in the commitment
> offense nor does [petitioner] suffer from such a disorder at this
> time.  His mental status is stable and is likely to remain so.  He
> expresses a desire to utilize his time while incarcerated in a
> productive manner, and it is anticipated he will do so.  He might
> benefit from attendance at Alcoholics Anonymous in an attempt to
> ascertain the role alcohol has played in his life.  Violence potential
> is considered below that of the average inmate.

14

1  (Id. at 21 [docket no. 15-6.])  None of these psychologists reference an anger management

2  problem.

3          The United States Court of Appeals for the Ninth Circuit has held that after an

4  inmate has "served the minimum number of years required by his sentence," Irons, 505 F.3d at

5  853, extended reliance solely "an unchanging factor, the circumstance of the offense and conduct

6  prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and

7  could result in a due process violation." Biggs at 917.[3]  California state courts have made similar

8  observations:

> [T]he commitment offense, this court has observed, is an
> unsuitability factor that is immutable and whose predictive value
> 'may be very questionable after a long period of time [citation].'
> [Citation.]  We have also noted, as has our Supreme Court, strong
> legal and scientific support that 'predictions of future
> dangerousness are exceedingly unreliable,' even where the passage
> of time is not a factor and the assessment is made by an expert.
> [Citation.]  Reliance on an immutable factor, without regard to or
> consideration of subsequent circumstances, may be unfair, run
> contrary to the rehabilitative goals espoused by the prison system,
> and result in a due process violation. [Citation.]

15  In re Elkins, 144 Cal.App.4th 475, 498-499 (2006).

16          The 2001 decision to deny petitioner parole was the fourth denial of parole

17  premised almost entirely on petitioner's commitment offense and alcohol abuse.  The record

18  demonstrates that at the time of the June 2001 decision the Board continued to rely on the

19  commitment offense as well as petitioner's alcohol abuse at the time of the commitment offense,

20  both unchanging factors.  There is no evidence in the record that petitioner has abused alcohol

21  while in prison or that he has denied a need to attend AA; rather, the record demonstrates a long

22  and continued history of attendance and participation in AA since at least 1991.

23          While the record is clear that there was a strong causal connection between

24  petitioner's use of alcohol and his violent crime, his past use of alcohol does not by itself

25  

26  _____
   [3]  The parole decision at bar was made fifteen years after petitioner's fifteen years to life
   sentence commenced.  Petitioner has now been incarcerated twenty-two years.

1   reasonably establish current unsuitability because there is no additional evidence to complete a

2   chain of reasoning between his past alcohol use and a finding that because of it he currently

3   poses an unreasonable risk of danger if released.[4]   In other words, in the absence of some

4   evidence to support a reasonable belief that petitioner might start using alcohol again, the fact

5   that he abused alcohol more than 20 years ago does not by itself represent some evidence that he

6   is currently dangerous.

7           Moreover, here the record does not contain any evidence to support reasonable

8   grounds to believe petitioner might start using alcohol if released.  There is no evidence that

9   petitioner's former desire for alcohol might still be present.  The record reveals that he has been

10  clean and sober for a substantial period of time.  There is no evidence that he refused, failed, or

11  did poorly in AA; rather the record demonstrates an active participation therein.  And there is no

12  evidence that petitioner ever used any type of illicit substance or alcohol during his incarceration.

13  Nor does the record support a reasonable belief that without further attendance at AA in prison,

14  petitioner might start using alcohol again.  "[A]lthough the state expects prisoners to behave well

15  in prison, the absence of serious misconduct in prison and participation in institutional activities

16  that indicate an enhanced ability to function within the law upon release are factors that must be

17  considered on an individual basis by the Governor in determining parole suitability."  In re

18  Rosenkrantz, 29 Cal.4th 616, 682, 128 Cal.Rptr.2d 104 (Cal. 2002).

19          The fact that alcohol abuse was involved in petitioner's commitment offense does

20  not constitute some evidence that petitioner might start using alcohol and become violent again,

21  and therefore that he currently poses an unreasonable risk of danger without further treatment.

22  Indeed, if petitioner's past use of alcohol established this unsuitability, the Board could deny

23  parole for the rest of petitioner's life based on this unchanging factor, without regard to

24  _____

25          [4]  The record provides no other past evidence of alcohol abuse, such as citations or
    convictions for drunk driving.  Petitioner has no criminal record, either juvenile or adult, other
26  than his commitment offense and illegally entering the United States.

1   subsequent evidence that petitioner has no current desire for alcohol and that there is little current

2   likelihood of alcohol relapse, let alone a return to violent conduct as a result of it.  The Board's

3   passing reference that petitioner "had been in AA for quite awhile" demonstrates the Board failed

4   to appropriately acknowledge petitioner's long and faithful commitment to the AA program.

5           The Board's reliance on the circumstances of petitioner's criminal offense to

6   support the denial of parole was unsupported by any evidence in the record sufficient to meet the

7   applicable legal standard.  In language that on this record appears to be boilerplate, it found that

8   the commitment offense was "carried out in an especially callous manner" and that "the motive

9   for the crime was very trivial in relation to the offense."  (Answer, Ex. B, at 28.)  These terms

10   have been defined by the California courts as follows:

11           A prisoner's commitment offense may constitute a circumstance
        tending to show that a prisoner is presently too dangerous to be
12       found suitable for parole, but the denial of parole may be
        predicated on a prisoner's commitment offense only where the
13       Board can "point to factors beyond the minimum elements of the
        crime for which the inmate was committed" that demonstrate the
14       inmate will, at the time of the suitability hearing, present a danger
        to society if released.  [In re] Dannenberg, 34 Cal.4th [1061] at
15       1071, 23 Cal.Rptr.3d 417, 104 P.3d 783 (Cal.2005).  Factors
        beyond the minimum elements of the crime include, *inter alia*, that
16       "[t]he offense was carried out in a dispassionate and calculated
        manner," that "[t]he offense was carried out in a manner which
17       demonstrates an exceptionally callous disregard for human
        suffering," and that "[t]he motive for the crime is inexplicable or
18       very trivial in relation to the offense." Cal.Code. Regs., tit. 15
        § 2402(c)(1)(B), (D)-(E)."

19

20   Irons at 663; see also In re Singler, 161 Cal.App.4th 281, 73 Cal.Rptr.3d 864 (2008) (to support

21   denial of parole, the "factors beyond the minimum elements of the crime" "must be predicated on

22   "some evidence that the particular circumstances of [the prisoner's] crime-circumstances beyond

23   the minimum elements of his conviction-indicated exceptional callousness and cruelty with

24   trivial provocation, and thus suggested he remains a danger to public safety.")

25           In California, "[s]econd degree murder is defined as the unlawful killing of a

26   human being with malice aforethought, but without the additional elements--i.e., willfulness,

17

premeditation, and deliberation-that would support a conviction of first degree murder." <u>People v. Nieto Benitez</u>, 4 Cal.4th 91, 102 (1992).  "Malice, for the purpose of defining murder, may be express or implied.  (§ 188.)  It is express 'when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.'  (§ 188; <u>People v. Mattison</u> (1971) 4 Cal.3d 177, 182, 93 Cal.Rptr. 185, 481 P.2d 193.)  Implied malice is present "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188; <u>People v. Mattison</u>, <u>supra</u>.)."  <u>Id.</u> at 102-103.

Under California law,

> "all second degree murders by definition involve some callousness
> – i.e., lack of emotion or sympathy, emotional insensitivity,
> indifference to the feelings and suffering of others.  [Citation.]  As
> noted, however, parole is the rule, rather than the exception, and a
> conviction for second degree murder does not automatically render
> one unsuitable."  (<u>In re Smith</u> (2003) 114 Cal.App.4th 343, 366.)
> . . . .
>
> Therefore, to demonstrate 'an exceptionally callous disregard for
> human suffering' [within the meaning of applicable provisions of
> the California parole statutes], the offense in question must have
> been committed in a more aggravated or violent manner than that
> ordinarily shown in the commission of second degree murder.

<u>In re Scott</u>, 119 Cal.App.4th 871, 891 (2004).  Such circumstances may include "rehearsing the murder, executing of a sleeping victim, stalking," <u>id.</u>, or evidence that the defendant "acted with cold, calculated, dispassion, or that he tormented, terrorized or injured [the victim] before deciding to shoot her; or that he gratuitously increased or unnecessarily prolonged her pain and suffering."  <u>In re Smith</u>, 114 Cal.App.4th at 367.

Similarly, in <u>In re Scott</u> the court noted that a finding of "triviality" sufficient to justify the denial of parole must also relate to present dangerousness:

> The offense committed by most prisoners serving life terms is, of
> course, murder.  Given the high value our society places upon life,
> there is no motive for unlawfully taking the life of another human
> being that could not reasonably be deemed "trivial."  The
> Legislature has foreclosed that approach, however, by declaring
> that murderers with life sentences must "normally" be given
> release dates when they approach their minimum eligible parole

1    dates. (Pen.Code, § 3041, subd. (a).)  The governing statute also
2    states that the Board shall set a release date "unless it determines
     that the gravity of current convicted offense or offenses, or the
3    timing and gravity of the current or past convicted offense or
     offenses, is such that consideration of the public safety requires a
4    more lengthy period of incarceration for this individual, and that a
     parole date, therefore, cannot be fixed at this meeting." (Pen.Code,
5    § 3041, subd. (b).)  This language means a "more lengthy period of
     incarceration" is called for where the gravity of the offense or
6    offenses of the prisoner in question is more indicative of a danger
     to the public if the prisoner is released than would ordinarily be the
7    case.  The reference in Board regulations to motives that are "very
     trivial in relationship to the offense" therefore requires
8    comparisons; to fit the regulatory description, the motive must be
     materially less significant (or more "trivial") than those which
9    conventionally drive people to commit the offense in question, and
     therefore more indicative of a risk of danger to society if the
     prisoner is released than is ordinarily presented.

10

11   In re Scott, 119 Cal.App.4th 871, 893 (2004).

12           Here, the Board described the offense as

13   carried out in an especially cruel manner.  It was carried out in a
     manner which demonstrates a callous disregard for human
14   suffering and the motive for the crime was inexplicable or very
     trivial in relation to the offense.

15

16   (Ex. B to Answer, at 28.)  These facts do not support a finding that the commitment offense was

17   committed in a "more aggravated or violent manner" than other second degree murders, and

18   review of the record reveals no evidence that petitioner's commitment offense was carried out

19   with the type of gratuitous violence, torture or disregard for the victim that would permit it to be

20   defined as "especially callous" as that term has been defined by the California courts.

21           The record before this court shows facts congruent with those described in the

22   state court's denial of petitioner's appeal.  The facts suggest that petitioner was, at the time of the

23   commitment offense, inebriated and angry.  Petitioner shot the weapon three times, but only hit

24   the victim once.  Moreover, while petitioner immediately left the scene, he ultimately phoned the

25   police, and, although he claims he shot the victim in self-defense, he has acknowledged

26   responsibility for killing the victim.

                                              19

1    The record before the Board and before this court does show facts sufficient to

2 support petitioner's conviction for second degree murder based on a finding of implied malice in

3 that "no considerable provocation" appeared for the actions that petitioner took which led to the

4 death of the victim.  The record does not, however, show any facts which suggest that the

5 circumstances of the commitment offense were sufficiently callous, or the motive for petitioner's

6 actions sufficiently trivial, that twenty-two years after the offense the circumstances of the

7 commitment offense would still suggest that petitioner remained a danger to society.[5]  Absent

8 such facts, the Board's reliance on petitioner's criminal conviction to support the denial of parole

9 violates petitioner's right to due process.

10    In addition, the Board's characterization of Dr. Carswell's report as not totally

11 supportive of petitioner's release on parole misstates the report.  Dr. Carswell stated that should

12 petitioner be released on parole, Dr. Carswell expected petitioner would be able to maintain his

13 present gains in the community.  (Lodged Documents, at 79 [docket no. 14-3.])  His

14 dangerousness upon release to the community was assessed as only slightly higher than the

15 average citizen in the community.  (Id.)  And, while a return to alcohol was identified as a

16 significant risk factor, petitioner's record demonstrates his commitment to AA.  His lack of

17 prison disciplinaries, including any reference to alcohol use or abuse while incarcerated, supports

18 that AA commitment.

19    Moreover, review of Dr. Carswell's report fails to proffer support for the Board's

20 finding that there "is a need for a longer period of observation and evaluation or treatment" or

21 that petitioner "has not completed programming which is essential to his adjustment and needs

22 additional time to gain that programming."  (Respondents' Ex. B, at 31.)  Indeed, Dr. Carswell

23

24    [5]  The Board also referred to petitioner's use of alcohol at the time of the offense.  It is
unclear, because the Board did not elaborate, how this finding relates in any way to a
25 determination concerning the callousness of the offense or the trivialness of the motivation.
Moreover, the record amply demonstrates that petitioner's history of alcohol abuse has been in
26 remission for years.

1  stated petitioner "has no mental health disorder which would necessitate treatment, either during

2  his incarceration period or after parole." (Lodged Documents at 79 [docket no. 14-3].)

3          The correctional counselor's view that petitioner is required to submit to anger

4  management therapy is refuted by at least three psychologists who unequivocally found petitioner

5  had no need for therapy. Here, petitioner's model behavior in prison demonstrates that he does

6  not presently have an anger management problem; he has sustained no prison disciplinaries for

7  fights or anger problems, and his work records, mostly satisfactory or above, do not demonstrate

8  petitioner has an anger problem. Petitioner has been essentially disciplinary-free throughout his

9  twenty-two year tenure in prison, and has no pre-offense record of violence or anger management

10  problems. After review of the record, this court finds there is no evidence to support the

11  correctional counselor's position that petitioner should be required to attend anger management

12  therapy.

13          Given the psychological evaluations, petitioner's work history while in prison, as

14  well as his prior vocation as a tailor and watch and jewelry repairman, this court finds no

15  evidence to support the Board's position that petitioner needs more self-help programming or to

16  complete a vocation. Petitioner has faithfully attended AA, which is the self-help program most

17  connected to the commitment offense. There is nothing in the record to demonstrate he needs

18  additional counseling in the prison setting in order to demonstrate that he can maintain his gains

19  in society.

20          Prison officials viewed the fact that petitioner was carrying a concealed weapon

21  during the commitment offense and had illegally entered the United States as a form of criminal

22  history. However, the weapon was part of the crime charged and should not be counted twice

23  against petitioner. Insofar as petitioner's illegal alien status, there is an INS hold on petitioner

24  suggesting he will be deported upon his release from state prison. Both of these facts are also

25  unchanging factors upon which prison officials may not continue to rely in denying petitioner

26  parole where he does not pose an unreasonable risk of danger to the community.

1   Finally, petitioner has evidenced remorse for his commitment offense.

2   (Respondent's Ex. B, at 7, 22.)  Although petitioner continues to characterize his crime as self-

3   defense, he has accepted responsibility for taking the victim's life.  Petitioner acknowledges he

4   would do something very different today.  (Id. at 22.)  The Board's reliance on petitioner's failure

5   to accept responsibility violated California Penal Code § 5011(b).  Id.[6]

6   Petitioner is now 65 years old and has served 22 years in state prison.  He has

7   obtained a GED and has vocational skills that would provide him the means to support himself.[7]

8   He has family members, both in the United States and in Mexico, who have offered their support

9   and would be willing to allow him to live with him should he be paroled.  (Lodged Documents,

10  at 10-22; 25-83 [docket no. 15-5.]; Respondent's Ex. B, at 17; Traverse at 10.)  Petitioner has

11  solid parole plans, including a place to live and employment options; petitioner has had an

12  "exemplary" prison record for most of his period of incarceration, with only one minor

13  disciplinary violation taking place in 1997.

14  Petitioner's commitment offense could be a sufficient basis to deny his parole if it

15  indicated a risk of re-offending and a danger to society.  It does not.  Whether petitioner is

16  currently dangerous enough to society to preclude his parole depends on whether his judgment is

17  likely to fail him as gravely as it did when he drank to excess and shot a stranger at a bar.  By

18  itself, however, petitioner's exercise of poor judgment twenty-two years ago is not probative,

19  absent any more recent indicators, of his exercise of poor judgment again at his age of 65.

20  Petitioner's positive prison record over the past two decades indicates that he is suitable for

21  parole.

22  _____

23  [6]  California Penal Code § 5011(b) provides: "The Board of Prison Terms shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed."

24

25  [7]  Petitioner argues that the Board's requirement that he obtain a vocation or upgrade educationally "defies reality and reason" particularly for an "aged foreign prisoner."  (Traverse at

26  10.)  Petitioner is 65, near retirement age, and has chronic back problems, high blood pressure and other medical issues that limit his ability to work.  (Id.)

1       Thus, this court rejects the Board's reliance on the gravity of petitioner's

2  commitment offense or alcohol abuse to deny parole on this record.  Given petitioner's

3  rehabilitation, and model conduct while in prison, the court finds that his commitment offense,

4  which occurred twenty-two years ago, does not demonstrate that his release will pose an

5  imminent danger to public safety.  Moreover, the court finds that under the circumstance

6  presented by this case the Board's reliance on these "stale and static factor[s]" to deny parole

7  after his minimum term has expired violates petitioner's due process rights.  Cf. Irons, 505 F.3d

8  at 846 ("due process was not violated when these prisoners were deemed unsuitable for parole

9  prior to the expiration of their minimum terms").

10      In addition, the Board's continued reliance on unchanging factors to deny

11  petitioner parole violated petitioner's right to due process.  Biggs v. Terhune, 334 F.3d 910, 917

12  (9th Cir. 2003)("A continued reliance in the future on an unchanging factor, the circumstance of

13  the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused

14  by the prison system and could result in a due process violation.")  This court has reviewed the

15  record and determined that the record lacked some evidence supporting the Board's denial of

16  parole.  For all of these reasons, the writ should be granted.

17      In accordance with the above , IT IS HEREBY RECOMMENDED that:

18          1.  Petitioner's application for a writ of habeas corpus be granted; and

19          2.  Respondents be directed to forthwith set a parole release date for petitioner.

20      These findings and recommendations are submitted to the United States District

21  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days

22  after being served with these findings and recommendations, any party may file written

23  objections with the court and serve a copy on all parties.  Such a document should be captioned

24  "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that

25  /////

26  /////

failure to file objections within the specified time may waive the right to appeal the District

Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  July 7, 2008.


UNITED STATES MAGISTRATE JUDGE

001; leon2631.157a